UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MACDERMID OFFSHORE SOLUTIONS, LLC, | § § § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-2483 |
| | § | |
| NICHE PRODUCTS, LLC, *et al*, | § § | |
| Defendants. | § § | |

## OPINION AND ORDER

Pending before the Court are three motions: (i) the Motion for Leave to File Second Amended Complaint (Doc. 32), submitted by Plaintiff MacDermid Offshore Solutions, LLC ("MacDermid"); (ii) the Motion for a Preliminary Foreign Anti-Suit Injunction (Doc. 14), also submitted by MacDermid; and (iii) the Motion to Dismiss for Forum Non Conveniens and International Comity, or in the Alternative, to Stay (Doc. 6), submitted by Defendants Niche Products, LLC ("Niche LLC") and Niche Products, Ltd. ("Niche Ltd.") (collectively, "Defendants").[1]

---

[1] Responsive pleadings include the following:

- MacDermid's Response to Defendants' Motion to Dismiss for Forum Non Conveniens or to Stay (Doc. 12)
- Defendants' Reply in Support of their Motion to Dismiss for Forum Non Conveniens and International Comity, or in the Alternative, to Stay (Doc. 19)
- Defendants' Response in Opposition to Plaintiff's Motion for a Preliminary Foreign Anti-Suit Injunction (Doc. 21)
- MacDermid's Reply in Support of its Motion for a Preliminary Foreign Anti-Suit Injunction (Doc. 24)
- Defendants' (1) Opposition to MacDermid's Motion for Leave to File Second Amended Complaint and (2) Defendants' Supplement to Their Motion to Dismiss for Forum Non Conveniens and International Comity, or in the Alternative, to Stay (Doc. 35)
- MacDermid's Memorandum of Law in Further Support of Its Motion for Leave to Amend the Complaint, and Opposition to Defendants' Supplement (Doc. 37)
- Defendants' Sur-Reply in Opposition to MacDermid's Motion for Leave to File Second Amended Complaint and in Support of Defendants' Motion to Dismiss for Forum Non Conveniens (Doc. 38)

Having considered the pleadings, the factual and procedural history of this dispute, and the applicable law, the Court concludes that (i) the motion for leave to file the second amended complaint should be granted; (ii) the motion for a preliminary foreign anti-suit injunction should be denied; and (iii) the motion to dismiss for forum non conveniens should be denied, but the alternative motion to stay should be granted.

## I.      Background

The situation before the Court involves three parties and two separate civil actions. One party is MacDermid; the others are Niche Ltd. and Niche LLC. MacDermid is a Delaware limited liability company that maintains a place of business in Texas. Doc. 32-2 ¶ 2. MacDermid develops, manufactures, and sells products and services for the offshore industry, including a line of hydraulic fluids for use in subsea production control systems. Doc. 32-2 ¶¶ 11, 13. Because different countries have different regulations for the composition of subsea hydraulic fluids, MacDermid produces various formulations to meet those local regulations. Hollinger Decl. ¶ 6, Oct. 8, 2012, Doc. 12-1. In the United States, MacDermid sells a fluid known as Oceanic HW443 ("Oceanic"), Doc. 12 at 2; in the United Kingdom, it sells another version of that fluid known as Oceanic HW443 V2 ("Oceanic V2"), McKechnie Decl. ¶ 10, Sep. 18, 2012, Doc. 6-1. The alleged difference in performance between these two versions forms the origin of this dispute. *See, e.g.*, Doc. 32-2 ¶ 28.

On the other side of the dispute are Niche Ltd. and Niche LLC. Niche Ltd. is a British company headquartered in England. Doc. 6-1 ¶ 2. It competes with MacDermid in the development, manufacture, and sale of fluids for use in subsea production control systems. Doc. 6-1 ¶ 5. Niche LLC is a Texas company that was formed as a joint venture by Niche Ltd. and

Trident Deepwater Solutions, also a Texas company. Doc. 6-1 ¶ 3. It sells Niche Ltd.'s subsea fluids in the United States and Mexico. Doc. 6-1 ¶ 3.

The first civil action is the one before this Court, initiated on August 20, 2012, when MacDermid filed its original complaint (Doc. 1); the second is the action initiated by Niche Ltd. on September 18, 2012 in the Patents County Court ("PCC") in England, Lye Decl. ¶ 4, Doc. 6-2. In the original complaint filed in this Court, MacDermid stated causes of action against both Defendants for (i) Lanham Act violations; (ii) unfair competition; (iii) tortious interference; and (iv) defamation. Doc. 1 at 4-7. MacDermid also sought a declaratory judgment that the statements in its press release—one of the points of argument in the PCC action, as described below—were neither false nor malicious. Doc. 1 at 8. Underlying all of these causes of action was a single allegation of fraud: that Defendants had "created and distributed contrived, deceptive, false and inaccurate comparative testing with respect to MacDermid's Oceanic HW443 products," and used such testing to, among other things, "deceive the purchasing public." Doc. 1 ¶¶ 20, 25. The testing MacDermid was referring to was that performed by Niche Ltd. in the United Kingdom. Doc. 6-1 ¶ 11. That testing compared the performance of Oceanic and Oceanic V2, and, based on the results of the tests, Niche Ltd. concluded that the performance of Oceanic V2 was materially worse than that of the original formulation. Doc. 6-1 ¶ 11. According to Niche Ltd., it did not release the results publicly, but instead provided the results to "a small group of UK customers" and to Niche LLC, which provided them to another customer, Cobalt International Energy ("Cobalt"). Doc. 6-1 ¶ 12. According to MacDermid, those test results were "false and misleading" and were "designed to deceive." Doc. 1 ¶¶ 21, 25. Because this allegation of fraud served as the primary basis of all of MacDermid's causes of actions, this Court held MacDermid's complaint to the particularity standard required by Federal Rule of

Civil Procedure 9(b). Op. & Order 3, Jan. 16, 2013, Doc. 29 (citing *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) (applying Rule 9(b) "to all averments of fraud, whether they are part of a claim of fraud or not")). Finding that the complaint failed to meet that standard, the Court dismissed the complaint without prejudice and granted MacDermid twenty-one days' leave to amend. Doc. 29 at 7. Fourteen days later, MacDermid filed its first amended complaint (Doc. 30), but Defendants again filed a motion to dismiss (Doc. 31), arguing that MacDermid had still failed to plead sufficient details to sustain its claims. Rather than engage Defendants in a battle over that pleading, MacDermid elected instead to author a second amended complaint with additional details.

In the meantime, on September 18, 2012, Niche Ltd. filed its Particulars of Claim against MacDermid in the PCC (Niche LLC is not a party to that suit). Doc. 6-1 ¶ 14. That complaint arises from MacDermid's actions in response to Defendants' distribution of their comparative testing results and related "campaign" against Oceanic V2. Specifically, Niche Ltd. states that "[w]hen [MacDermid] saw Niche Ltd.'s confidential [comparative testing] report, it lashed out, taking the issue public" by "sen[ding] a letter to certain of its customers and post[ing] a letter on its website attacking Niche Ltd." Doc. 21 at 9. Niche Ltd. also alleges that at approximately the same time MacDermid filed its original complaint in this Court, "MacDermid and its agents intentionally accessed Niche Ltd.'s computer systems without authorization" and downloaded confidential videos. Doc. 21 at 11. Consequently, Niche Ltd. filed claims in the PCC for (i) malicious falsehood; (ii) copyright infringement; and (iii) misuse of confidential information. Doc. 6-2 ¶¶ 3-4. Then, on the following day, Defendants filed their motion in this Court to dismiss this action for forum non conveniens, arguing that the dispute involves "a product designed, manufactured, and sold in the United Kingdom" and, therefore, that the case belongs in

the United Kingdom. Doc. 6 at 15. Three weeks later, MacDermid submitted its own pleading, a motion for a foreign anti-suit injunction, seeking symmetrically opposite results: enjoining Niche Ltd. from prosecuting its case in the United Kingdom. Doc. 14 at 5, 21. These two competing motions, along with MacDermid's motion for leave to file its second amended complaint, are now before the Court and are ripe for adjudication.

## II.     Discussion

### A.     *Motion for Leave to File Second Amended Complaint*

The basis of Defendants' opposition to MacDermid's motion is that the proposed amendment would be futile. Doc. 35 at 5-17. Specifically, Defendants argue that MacDermid still fails to "provide the 'who, what, when, where, and why' necessary to satisfy Rule 9(b)." Doc. 35 at 6. The starting point of this analysis is Federal Rule of Civil Procedure 15(a)(2), which provides that leave to amend shall be freely given "when justice so requires." The Fifth Circuit has elaborated that "leave to amend is to be granted liberally unless the movant has acted in bad faith or with a dilatory motive, granting the motion would cause prejudice, or amendment would be futile." *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 322 (5th Cir. 2009). "Futility," in this context, "mean[s] that the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co*, 234 F.3d 863, 873 (5th Cir. 2000) (applying Rule 12(b)(6)). Because its causes of action are based on allegations of fraud, to properly state a claim for relief, MacDermid must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent," *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (applying Rule 9(b)); in other words, the "who, what, when, where, and why." As this is the same standard that the original complaint failed to meet, the question boils down to

whether MacDermid has remedied the defects that existed in the original complaint. The Court concludes that it has.

In order to understand why this is so, it is unnecessary to recite every specific fact alleged in the second amended complaint. It is sufficient, in this instance, to examine the details of the allegedly fraudulent activity underpinning MacDermid's claims: Defendants' testing of Oceanic V2 and their distribution of the resulting report. In describing these events, MacDermid states that "Niche Ltd., under the direction and supervision of Niche Ltd. employees, including Tom McKechnie, conducted erroneous and misleading tests of MacDermid's Oceanic product," and, "[b]ased on these tests, on or about May 1, 2012, … created a report that, among other misrepresentations, falsely indicated that MacDermid's European Oceanic product had undergone a material formulation change that detrimentally affected its performance" (who, what, when). Doc. 32-2 ¶¶ 27-28. MacDermid then lists eleven alleged misrepresentations contained in the report and five reasons explaining why those descriptions are false (what, why). Doc. 32-2 ¶¶ 29-30. MacDermid goes on to describe the distribution of the report, including that "Niche Ltd. gave the Niche Report to Niche LLC, including [Bradley] Jeter and [Michael] Mahaney, and shortly thereafter, Niche LLC gave Cobalt the report"; that "[o]n or about May 2, 2012, Niche Ltd., including McKechnie, directly gave FMC the Niche Report"; and that on or about May 25 and May 30, 2012, "Niche LLC, and Niche Ltd., including McKechnie, gave MacDermid's customers, including FMC, access to videos" that filmed the allegedly deceptive testing (who, when, where). Doc 32-2 ¶¶ 32, 34, 37.

The details of these allegations are sufficient to pass muster, given that "Rule 9(b) does not 'reflect a subscription to fact pleading.' " *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185-86 (5th Cir. 2009) (quoting *Williams*, 112 F.3d at 178). Instead, it merely supplements Rule

8(a)'s standard of notice pleading, requiring " 'simple, concise, and direct' allegations of the 'circumstances constituting fraud.' " *Id.* at 186. Furthermore,

> "Rule 9(b)'s ultimate meaning is context-specific," and thus there is no single construction of Rule 9(b) that applies in all contexts. Depending on the claim, a plaintiff may sufficiently "state with particularity the circumstances constituting fraud or mistake" without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand.

*Id.* at 188 (quoting *Williams*, 112 F.3d at 178) (footnote omitted). In this context, where fraud is not the claim, but rather the basis for other claims, it is enough that that basis alone is articulated according to Rule 9(b)'s heightened pleading standard. Because it is, MacDermid's proposed amendment cannot be said to be futile, and its motion for leave to file its second amended complaint should be granted.

### B.      *Motion for Preliminary Foreign Anti-Suit Injunction*

"[A] preliminary injunction is 'an extraordinary remedy,' " and, therefore, should be considered as the exception, not the rule. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363-64 (5th Cir. 2003) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)). "When a preliminary injunction takes the form of a foreign antisuit injunction, [the Court is] required to balance domestic judicial interests against concerns of international comity." *Id.* at 366. Domestic judicial interests include the need to "prevent vexatious or oppressive litigation" and to "protect the court's jurisdiction." *Id.* (footnotes and internal quotation marks omitted).

> In determining whether proceedings in another forum constitute vexatious or oppressive litigation, [the Court looks] for the presence of several interrelated factors, including (1) "inequitable hardship" resulting from the foreign suit; (2) the foreign suit's ability to "frustrate and delay the speedy and efficient determination of the cause"; and (3) the extent to which the foreign suit is [duplicative] of the litigation in the United States.

*Id.* (footnotes omitted). Weighing against these interests are notions of international comity, which, though "not wholly dominat[ing the Court's] analysis to the exclusion of these other concerns," are "not insubstantial":

> Neither a matter of legal obligation nor of mere courtesy, comity has long counseled courts to give effect, whenever possible, to the executive, legislative and judicial acts of a foreign sovereign so as to strengthen international cooperation. The doctrine of comity contains a rule of "local restraint" which guides courts reasonably to restrict the extraterritorial application of sovereign power. In this vein, we have impliedly recognized the importance of comity … when prior steps in resolving a dispute have taken place in international fora.

*Id.* at 366, 371 (footnotes omitted).

MacDermid makes one main argument regarding the question of inequitable hardship[2]: that it "cannot bring its current claims as counterclaims in the Patents County Court." Doc. 14 at 14. This argument is not convincing, as any inability to bring counterclaims in the PCC and the resulting need to prosecute a separate action are defects of MacDermid's own making. MacDermid acknowledges as much, admitting that the PCC cannot hear its defamation claim "*except with the consent of all parties* or if the High Court so orders." Doc. 12-2 ¶ 6 (emphasis added). Defendants have already agreed to give such consent, Doc. 6 at 6, but MacDermid apparently has not, despite awareness of its ability to do so. In the United Kingdom, MacDermid "mentioned to the [PCC] Judge … that, if a counterclaim was brought [there], it would be in defamation." *MacDermid Offshore Solutions v. Niche Prods. Ltd.* [2013] EWHC 1493 (Ch) ¶ 84. Nevertheless, "[n]o defamation proceedings have in fact been commenced." *MacDermid* [2013] EWHC 1493 (Ch) ¶ 85. The High Court surmised, "One reason for that may be that MacDermid has concerns that, by launching such proceedings, it would weaken its position in relation to its

---

[2] MacDermid makes additional points, but they are more relevant to other prongs of this analysis. For example, that "MacDermid will be forced to litigate the same issues in two forums" and that "Niche[ Ltd.'s] suit risks multiple and inconsistent judgments," Doc. 14 at 13, both go to the issue of duplicative litigation; that England "is far removed from the locus of this dispute," Doc. 14 at 13, goes more to the protection of the Court's jurisdiction and notions of international comity.

stay application [in the PCC]. However, another reason may be that it simply does not want such proceedings to be conducted in the English courts." *MacDermid* [2013] EWHC 1493 (Ch) ¶ 85. Regardless, such proceedings are, in fact, possible to conduct in the English courts, MacDermid's protests notwithstanding.

Second, regarding the foreign suit's ability to frustrate and delay the speedy and efficient determination of this case, MacDermid simply rephrases the same argument made above: that "*nothing is [to be] gained*" from the PCC action because the PCC "lacks jurisdiction to consider this whole dispute." Doc. 14 at 15-17 (emphasis in original). As already explained, this is not the case. Additionally, MacDermid claims that the PCC does not allow discovery or cross-examination and limits trial to two days, but these claims are also not the case. *See* The Patents County Court Guide 16, Doc. 35-7 Ex. A (explaining the procedure for permitting "disclosure of documents" and "cross-examination at trial"); Order ¶ 6, *Niche Prods. Ltd. v. MacDermid Offshore Solutions, LLC* [2013] EWPCC 11, Doc. 35-7 Ex. B (estimating the January 14, 2014 trial on Niche Ltd.'s claims to last approximately three days). Once again, MacDermid's choice not to pursue its counterclaims in the United Kingdom is not equivalent to an inability to bring such claims; therefore, it cannot form the basis of an objection to that foreign forum. Moreover, because the PCC trial is scheduled to begin eight months before the trial is scheduled in this court, *see* Scheduling Order, Doc. 28 (setting trial for September 8, 2014), if the PCC action has any effect, it would likely be to *increase* the speed and efficiency of this action by first resolving the basic dispute from which all of MacDermid's claims spring: whether Niche Ltd.'s tests of Oceanic V2 were fraudulent.

Third, although the English suit is indeed duplicative of this litigation, this factor, by itself, does not tip the scales in favor of an injunction. MacDermid cites only one case, *Kaepa,*

*Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996), supporting the notion that because "MacDermid's suit was filed first[,] … any duplication [must] be weighed in favor of an injunction enjoining Niche from prosecuting its later-filed suit in the Patents County Court." Doc. 14 at 12.[3] But the situation in *Kaepa* can be readily distinguished from the case at bar. In affirming the district court's granting of a foreign anti-suit injunction, the *Kaepa* court explained:

> [T]he dispute has been long and firmly ensconced within the confines of the United States judicial system: [the defendant] consented to jurisdiction in Texas; stipulated that Texas law and the English language would govern any dispute; appeared in an action brought in Texas; removed that action to a federal court in Texas; engaged in extensive discovery pursuant to the directives of the federal court; and only then, with the federal action moving steadily toward trial, brought identical claims in Japan. Under these circumstances, we cannot conclude that the district court's grant of an antisuit injunction in any way trampled on notions of comity.

76 F.3d at 627-28. None of those facts apply here, where Niche Ltd. initiated the English action less than a month after MacDermid brought suit in this Court; nor do the facts adduced by MacDermid explain why, of the two duplicative civil suits, this one should take precedence.

Likewise, regarding the protection of this Court's jurisdiction, MacDermid's only argument is "that the court that first acquires jurisdiction should … determine the proper venue for a dispute." Doc. 14 at 17. While this is a proper statement of American law as to which court should decide the proper venue, it says nothing about which venue is, in fact, proper. It is at this

---

[3] MacDermid cites two additional cases, but neither supports its argument. First, MacDermid offers that "[t]he court first securing jurisdiction has the *authority and power* of enjoining the parties to the litigation from proceeding in another jurisdiction," but provides no authority suggesting that a court *should* exercise such power simply *because* it secured jurisdiction first. Doc. 14 at 12 (emphasis added) (quoting *In re Unterweser Reederei, GMBH*, 428 F.2d 888, 891 (5th Cir. 1970), *vacated sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)) (internal quotation marks omitted). MacDermid quotes another opinion for the proposition that "[a]llowing the second suit to proceed would both multiply and divide the case." Doc. 14 at 12 (quoting *Shell Offshore, Inc. v. Heeremac*, 33 F. Supp. 2d 1111, 1112 (S.D. Tex. 1999)) (internal quotation marks omitted). This quotation is disingenuous. Not only was the quoted conclusion drawn from a case with a factual situation distinctly different from the one here, it did not even result in the granting of an injunction there. *See Shell Offshore*, 33 F. Supp. 2d at 1113 (holding that "[w]hile the distinct action in London is adjudged to be an unjustified, disingenuous complicating maneuver, an injunction is not *now* needed").

point in the analysis, then, that determining "the locus of this dispute" becomes significant and notions of international comity must be considered.

Although MacDermid's argument is that England is far removed from the locus of this dispute, its factual allegations belie this claim. As stated above, the central allegation is that Niche Ltd. conducted and distributed deceptive, false, and inaccurate testing of MacDermid's product, Oceanic V2. This product is manufactured and marketed specifically for the European Union marketplace—MacDermid refers to it as "European Oceanic," Doc. 12-1 ¶ 11—and is thus designed to meet specific EU regulations. *See* Doc. 12-1 ¶ 6. MacDermid's "sister company" in the United Kingdom, MacDermid Canning Ltd., appears to have played a significant role in the research, development, and production of Oceanic V2 in its UK facilities. *See* Doc. 12 at 8 (stating that "[o]nly Canning has research facilities in the United Kingdom"); MacDermid's "Contact Us" Webpage, Doc. 21-2 (listing its Wigan, England location as a manufacturing site); Press Release: MacDermid to Begin Producing Offshore Products in Melbourne, Austl., Doc. 21-3 (same); "Welcome to the Offshore Division of MacDermid Inc." Webpage, Doc. 21-6 (stating that "[o]ur research and development laboratory and associated functions are centred at Wigan UK"). And though MacDermid does not allege the location of Niche Ltd.'s testing, *see* Doc. 32-2 ¶ 27, Niche Ltd. states that it was "performed … by personnel at Niche Ltd.'s office in the United Kingdom." Doc. 6-1 ¶ 11. Finally, it is clear from MacDermid's response to Niche Ltd.'s actions that it perceived those actions to pose a threat in the UK. In a letter to consumers authored on "MacDermid Offshore Solutions (UK)" letterhead, MacDermid discussed the specifications and performance of Oceanic V2, the relevant UK environmental regulations, and the fact that "MacDermid ha[d] been producing Oceanic 443

under the v2 designation for over two years in the UK." Letter from MacDermid to Industry Colleague[s] (June 18, 2012), Doc. 21-7.

The allegations of actions in the United States are less robust. For example, MacDermid's main US-based claim in the second amended complaint is that "Niche Ltd. and Niche LLC began their campaign [to misrepresent Oceanic V2] at an annual conference called the Offshore Technology Conference ('OTC')" in Houston, Texas, but the complaint does not expound on this allegation. Doc. 32-2 ¶¶ 20-21. In earlier pleadings, MacDermid claimed that "Niche employee[s,] including Jeter[ ] and Mahaney[,] approached various Texas-based MacDermid customers" at the OTC. Doc. 12-1 ¶ 12. Now, however, MacDermid states only that "Niche Ltd. and Niche LLC *conspired* with Cobalt to accomplish the objectives of their conspiracy to distribute the false and misleading report at the OTC." Doc. 37 at 17 (emphasis added). MacDermid goes on to explain:

> Niche Ltd. did the testing and prepared the report. Niche Ltd. gave the report to Niche LLC for the purpose of distributing it to MacDermid's Texas customers. Agents of Niche LLC did so by giving PowerPoint presentations in Texas and in subcontracting their tortious behavior to Cobalt, which stood to gain from Niche's false and misleading advertising, and who attended and distributed the report at the OTC. Thus, while *full time employees* of Niche may have not physically entered the OTC building, *agents* of Niche, including agents of Cobalt, certainly did. Since this was the collective, premeditated, tortious plan of Niche Ltd., Niche LLC, and Cobalt all along, the fact that full time employees of Niche did not physically enter the OTC building is immaterial.

Doc. 37 at 17 (emphasis in original).

The bottom line, however, is that these alleged activities in the United States are secondary to those in the United Kingdom, both in temporal sequence and in legal significance. The reports that were allegedly distributed in the US concerned a UK product, Oceanic V2, and were based on testing performed in the UK by a UK company, Niche Ltd.; and whether the reports were fraudulent ultimately depends on whether the tests themselves were fraudulent.

Indeed, the origins of this dispute lie in England, and the allegations of activities in the United States are not substantial enough to justify the "extraordinary remedy" of enjoining the parties from litigating in the English courts.[4] On the contrary, if anything, the balance of factors tilts in favor of that forum over this one.

### C.      Motion to Dismiss for Forum Non Conveniens

Under the doctrine of forum non conveniens, "a federal trial court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 828 (5th Cir. 1993). In order to obtain a dismissal for forum non conveniens, a defendant must demonstrate "(1) the existence of an available and adequate alternative forum and (2) that the balance of relevant private and public interest factors favor dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003). The defendant's burden is a heavy one, as there is a general presumption that a plaintiff's chosen forum is appropriate. *Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).

### 1.      Alternate Forum

"A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000) (internal quotation marks omitted). It is adequate "when the parties will not be deprived of

---

[4] Although "MacDermid requests a hearing to ensure that the correct version of the facts of this case is before the court," Doc. 24 at 2, oral hearings are required to resolve factual disputes only "before a preliminary injunction [is] *granted*," *Kaepa*, 76 F.3d at 628 (emphasis added) (quoting *Commerce Park at DFW Freeport v. Mardian Const. Co.*, 729 F.2d 334, 341 (5th Cir. 1984)) (internal quotation marks omitted). Furthermore, it would be unhelpful in this instance because the Court's denial of the foreign anti-suit injunction does not turn on any disputed facts. Even accepting MacDermid's allegations as true does not change the fact that the focal point of this litigation is the truth or falsity of the tests conducted in England.

*all* remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Id.* (emphasis added) (internal quotation marks omitted).

There can be little doubt that the English court system is both available and adequate. As far as the parties are concerned, MacDermid and Niche Ltd. are already before the PCC, and Niche LLC has agreed to submit to its jurisdiction. Doc. 6 at 6. This is sufficient to "render[ ] that forum available for purposes of forum non conveniens analysis." *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 830 (5th Cir. 1986). As for the parties' claims, the PCC can hear a defamation claim "with the consent of all parties," Powell Decl. ¶ 6, Oct. 9, 2012, Doc. 12-2, and Defendants have agreed to give such consent, Doc. 19 at 7. Although MacDermid expresses concern that the UK "does not have an equivalent of either the Lanham Act or the Texas Deceptive Trade Practices Act," Doc. 12 at 14, the absence of a remedy for violations of specific statutes "does not make a forum inadequate." *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 797 (5th Cir. 2007). Indeed, "[t]he [substantive] law of the foreign forum is presumed to be adequate unless … the plaintiff is highly unlikely to obtain basic justice there," *id.* at 796 (internal quotation marks omitted); for example, if an unfavorable change in the law "results in the remedy provided by the alternative forum being so clearly inadequate or unsatisfactory such that it is no remedy at all," *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 728 (5th Cir. 1990) (internal quotation marks omitted).

That is not the case here. All of MacDermid's causes of action are premised on the same allegedly false statements, and there is no showing that MacDermid would be deprived of all remedies for these alleged wrongs. In fact, the record is clear that MacDermid has the ability in the UK to pursue claims such as defamation and malicious falsehood, regardless of whether it elects to do so. Thus, the issue is one of preference rather than adequacy, and preference is not

sufficient to deny the existence of an alternate forum. Given this existence, the analysis comes

down to the balance of private and public interest factors.

### 2.        *Private and Public Interest Factors*

Private interest factors include:

> the relative ease of access to sources of proof; availability of compulsory process
> for attendance of unwilling, and the cost of obtaining attendance of willing,
> witness[es]; possibility of view of premises, if view would be appropriate to the
> action; and all other practical problems that make trial of a case easy, expeditious
> and inexpensive.

*Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 342 (5th Cir. 1999) (quoting *Gulf Oil*

*Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Public interest factors include:

> the administrative difficulties flowing from court congestion; the "local interest in
> having localized controversies decided at home"; the interest in having the trial of
> a diversity case in a forum that is at home with the law that must govern the
> action; the avoidance of unnecessary problems in conflict of laws, or in the
> application of foreign law; and the unfairness of burdening citizens in an
> unrelated forum with jury duty.

*Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). In conducting this

analysis, no single private or public interest factor should be given conclusive weight. *Id.*

In this case, neither the private nor the public factors as a whole weigh heavily in either

direction; therefore, the argument for forum non conveniens is not strong enough to support

dismissal. But the analysis does not end there, as the true significance of the competing factors

lies in the manner in which they are divided: the factors favoring an English forum relate to

Niche Ltd.'s testing of Oceanic V2 in the United Kingdom; those favoring an American forum

relate to Defendants' alleged distribution of the test results in the United States. For example, the

private interest factors supporting litigation in English courts include that the proof regarding

Niche Ltd.'s tests and the reports produced therefrom are all located in the UK, Doc. 6 at 7-8,

and that the witnesses to those tests and, likely, the majority of witnesses to MacDermid's

research, development, and production of Oceanic V2 are located in the UK, Doc. 6 at 9. On the other hand, evidence and witnesses related to the alleged actions at the Offshore Technology Conference in Houston and the harms resulting therefrom are likely to be in the United States. Doc. 12 at 24. The public interest factors follow the same pattern. To the extent these factors indicate that the controversy is local to England, it is because the controversy surrounds a UK company's reports based on its testing of a UK product at its UK facilities. To the extent they indicate that the controversy is local to the United States, it is because an American company claims that the false and misleading reports about its product were distributed to its American consumers in Texas.

The significance of this distinction is that the alleged wrongfulness of Defendants' actions in the United States hinges on the wrongfulness of their earlier actions in the United Kingdom. As the High Court explained, "It is a technical issue which lies at the root of the dispute and which would lie at the root of [MacDermid's] defamation action…. After all, if Niche wins the technical issue, there is unlikely to be anything in a defamation claim." *MacDermid* [2013] EWHC 1493 (Ch) ¶ 86. That opinion affirmed the judgment of the Patents County Court, which stated:

> At the heart of this dispute is a simple question—whether Oceanic HW 443 v2 is materially different from Oceanic HW443 v1. If "yes" then Niche are right, if "no" then MacDermid are right. Both torts (malicious falsehood and, so far as I can see from the pleadings, infringement of the Lanham Act) have more to them than this question, such as the issue of malice in the UK, but in truth the centre of gravity of this dispute depends on that relatively simple factual question. To resolve the issue will require expert evidence, will involve a bit of chemistry and no doubt evidence about the performance of hydraulic fluids and their additives, but it is not an unduly complex technical issue. It is the kind of technical question decided in patent cases on a regular basis.

*Niche* [2013] EWPCC 11 ¶ 14. It is, in fact, just "the sort of question the case management machinery in the PCC was designed to deal with." *Niche* [2013] EWPCC 11 ¶ 41.

Importantly, this "technical issue" is precisely the matter for which all of the relevant private and public interest factors favor an English forum. Put another way, if this were the only issue in controversy, there would be no hesitation in dismissing the case for forum non conveniens. Hesitation arises, however, because if that issue is resolved in MacDermid's favor— in other words, if Niche Ltd.'s tests are found to be false and misleading—then MacDermid's claims would rest on a solid foundation. In such a circumstance, it would seem improper to close the doors of this Court to MacDermid, an American company, when it is seeking to redress wrongs allegedly perpetrated against it on American soil. *See, e.g.*, *Piper*, 454 U.S. at 255 ("[A] plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum."). But this action has not yet reached the point where such a conclusion can be drawn; it first requires resolution of the underlying dispute over the events in the United Kingdom.

Fortunately, in addition to the choice between dismissing and not dismissing the case for forum non conveniens, the Court has another option: granting a stay. *See Carlisle v. United States*, 517 U.S. 416, 438 (1996) (holding that district courts have the inherent power "to stay proceedings 'to control the progress of the cause so as to maintain the orderly processes of justice'" (quoting *Enelow v. N.Y. Life Ins. Co.*, 293 U.S. 379, 381-82 (1935))); *see also Hotvedt v. Schlumberger Ltd. (N.V.)*, 942 F.2d 294, 297 (5th Cir. 1991) (discussing the stay of an action on grounds of forum non conveniens). The advantage of this option is that it avoids duplicative litigation and precludes the possibility of inconsistent judgments on the core issue, while allowing adjudication of that issue in a single forum—importantly, the proper forum. *See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992) (noting that "a stay 'pending the outcome of litigation between the same parties involving the same or controlling issues is an acceptable means of avoiding unnecessary duplication of judicial

machinery' " (quoting *ACF Indus., Inc. v. Guinn*, 384 F.2d 15, 19 (5th Cir. 1967))). After such

adjudication, it should be clear whether MacDermid's claims have survived intact, been whittled

down, or defeated completely.

Finally, because this Court finds no grounds for granting a foreign anti-suit injunction or

dismissing this suit outright, there seems to be no more efficient means to manage the situation.

Even if MacDermid filed its claims as counterclaims in the English courts and "defamation

proceedings were commenced [there], it is likely that they would be stayed pending the outcome

of the PCC proceedings rather than that the PCC proceedings would be transferred to the High

Court to be heard together with the defamation action." *MacDermid* [2013] EWHC 1493 (Ch) ¶

86. It other words, it appears inevitable that the next step in this dispute will be the PCC's

adjudication of the central question: whether Oceanic V2 is, in fact, materially different from its

original formulation. Those proceedings are on pace for trial on January 14, 2014, and, after that

trial, if MacDermid still has claims to prosecute in this Court, it may then move to lift the stay

and reopen this case.

### III.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that MacDermid's Motion for Leave to File Second Amended Complaint

(Doc. 32) is **GRANTED** and MacDermid's Second Amended Complaint (Doc. 32-2), including

Exhibits A (Doc. 32-3) and B (Doc. 32-4), is accepted for filing. It is further

**ORDERED** that MacDermid's Motion for a Preliminary Foreign Anti-Suit Injunction

(Doc. 14) is **DENIED**. It is further

**ORDERED** that Defendants' Motion to Dismiss for Forum Non Conveniens and

International Comity, or in the Alternative, to Stay (Doc. 6) is **GRANTED** in part as to the stay

and **DENIED** in part as to dismissal. Accordingly, this case is **STAYED** and

**ADMINISTRATIVELY CLOSED** pending the outcome of the English action, at which time

any party may move to lift the stay and reopen the case.

SIGNED at Houston, Texas, this 2nd day of August, 2013.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE